UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Civil Case No. |
| ) | |
| $834,592.35 IN U.S. CURRENCY ) | |
| SEIZED FROM SYNOVUS BANK ) | |
| COMMERCIAL CHECKING ) | |
| ACCOUNT ENDING IN 920-7 ) | |

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW the United States of America (the "United States" or the "Government"), by and through Margaret E. Heap, United States Attorney for the Southern District of Georgia, and J. Bishop Ravenel, Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *In Rem*, with the following allegations:

### NATURE OF THE ACTION

1.  *In Rem* civil forfeiture is permissible under Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2.  The Defendant *In Rem* is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that the Defendant *In Rem* is any property, real or personal, involved in or attempted to be involved in, or traceable to such property involved in Money Laundering and Money Laundering Conspiracy in violation of 18 U.S.C. §§ 1956, 1957, 1956(h), and pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that the Defendant *In Rem* is any property, real or personal, which

- 1 -

constitutes or is derived from proceeds traceable to violations of Wire Fraud, Bank Fraud, and Wire and Bank Fraud Conspiracy in violation of 18 U.S.C. §§ 1343, 1344, 1349.

## THE DEFENDANT *IN REM*

3. The Defendant *In Rem* (hereinafter, the **"Defendant Property"**) represents the following asset:

> $834,592.35 in U.S. Currency Seized from Synovus Bank Commercial Checking Account Ending in 920-7.

The **Defendant Property** was seized on or about August 14, 2025, from Synovus Bank as the result of a federal seizure warrant authorized in the Southern District of Georgia on August 6, 2025. The Synovus Bank Commercial Checking Account Ending in 920-7 is referred to herein as "the Account."

## JURISDICTION AND VENUE

4. The United States brings this action *In Rem* in its own right to forfeit the **Defendant Property**.

5. This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345.

6. The Court has jurisdiction over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

7. The Court has *In Rem* jurisdiction over the **Defendant Property** pursuant to 28 U.S.C. § 1355(b).

8. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and/or omissions giving rise to the forfeiture of the **Defendant Property** occurred in this district.

9. Particularly, wires in furtherance of the wire fraud scheme began, continued, and completed in the Southern District of Georgia in violation of 18 U.S.C. § 1343; financial transactions in furtherance of the bank fraud scheme began, continued, and completed in the Southern District of Georgia in violation of 18 U.S.C. § 1344; acts in furtherance of a violation of 18 U.S.C. § 1349 (conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 and bank fraud in violation of 18 U.S.C. § 1344) occurred in the Southern District of Georgia; and attempts to commit violations of 18 U.S.C. §§ 1343 and 1344 (in violation of 18 U.S.C. § 1349) occurred in the Southern District of Georgia.

10. Additionally, acts in furtherance of violations of 18 U.S.C. §§ 1956, 1956(h), and 1957 occurred in the Southern District of Georgia; violations of the underlying specified unlawful activities, as described in the previous paragraph, occurred in the Southern District of Georgia; and attempts to commit violations of 18 U.S.C. §§ 1956 and 1957 occurred in the Southern District of Georgia.

11. The **Defendant Property** is currently in the possession of the United States and was seized from Synovus Bank, a financial institution operating in the United States including but not limited to in the Southern District of Georgia.

12. The **Defendant Property** is tangible.

## BACKGROUND INFORMATION

13. Participants and facilitators of scams and schemes find individuals across the world, commonly in the Unites States, to launder the proceeds of their illicit activity.

14. These individuals are known as "money mules."

15. Money mules can be victims of the scam or knowing and witting accomplices.

16. It is common practice for the participants and facilitators of scams and schemes to instruct the money mules to transfer money into and through various bank accounts in an attempt to conceal the illicit activity from law enforcement.

17. These concealment efforts endeavor to conceal and disguise the nature, source, ownership, and control of proceeds of the unlawful activity.

18. Money mules are often victims of similar scams and schemes.

19. During the scams and schemes, victims are often told by the participants and facilitators of the fraud to transfer money into an account which is owned or controlled by a money mule.

20. The money mule is then instructed to transfer the money to other accounts or convert them into other forms of currency for participants and facilitators to retrieve for their own personal use.

21. A remotely created check ("RCC") is created when a check, authorized by the payer and drawn on the payer's account, is issued on the payer's behalf by a

financial institution other than the paying bank and does not bear the payer's signature.

22. A RCC may be in the form of a paper check or an electronically created item.

23. An electronically created item is an electronic image that has all the attributes of an electronic check or electronic returned check but was created electronically and not from a paper.

24. A RCC typically occurs when the holder of a checking account authorizes a payee to draw a check on that account but does not actually sign it.

25. In place of the signature of the account holder, the RCC generally bears a statement that the customer authorized the check or it bears the customer's printed or typed name.

26. RCCs commonly have a typed statement in lieu of a signature, such as "No Signature Required," "Signature on File," "Authorized by the Depositor," or "Authorized by the Payer."

27. RCCs are often used for one-time or recurring payments.

28. A returned deposited item ("RDI") refers to a check or other negotiable instrument deposited into an account, but later returned unpaid by the bank upon which it was drawn.

29. RDIs may occur as a result of various issues including non-sufficient funds, closed account, frozen/restricted account, stop payment request, and fraud.

30. Specific to the instant matter, RDIs occurred when the account holding the funds to cover the check stopped and/or reversed payments after being alerted fraud had occurred or was about to occur.

31. Synovus Bank offers a Lockbox Deposit Service to commercial business account holders to streamline receipt of account receivable payments.

32. The account holder instructs their customers to mail payments to a designated P.O. Box controlled by Synovus Bank.

33. The customer payments can be in the form of RCCs, draft checks, and/or money orders.

34. Upon receipt, Synovus Bank processes and deposits the payments into the commercial business account holder's account.

35. Synovus Bank is defined as a financial institution pursuant to 18 U.S.C. § 20 and is insured by the Federal Deposit Insurance Corporation, and was so defined and insured during the course of the criminal behavior described herein.

36. A person identified herein as "Owner" is the owner of a business located in Brooklet, within the Statesboro Division of the Southern District of Georgia, which business is identified as "the Business" herein.

37. At all times during the alleged fraud, Owner developed and managed all of the Business operations from the Business's Brooklet, Georgia office.

38. Owner is and was the signor and manager of the Account which contained the **Defendant Property** during the time period of the events described herein.

39. A relative of the Owner, identified herein as "Person 1," was also listed as a signatory on the Account.

40. The Account received deposits through Synovus' Lockbox Deposit Service.

41. Specific to the instant matter, Owner electronically authored and submitted to Synovus Bank the requisite forms to permit Genesis Marketing ("GM"), described below, to direct RCCs into the Owner's Lockbox Deposit Service account.

42. Owner submitted the forms through Synovus Bank's internet web portal, via a wire transaction, using the Business's office computer located in Brooklet, Georgia.

43. Financial transactions involving the Account held by Synovus Bank, from which the **Defendant Property** was seized, including but not limited to RCCs and other deposits, RDIs, and wires caused wires in interstate commerce to begin, continue, and complete in the Southern District of Georgia.

## FACTS AND BASIS FOR FORFEITURE

44. In or about September 2023, Owner entered into a business agreement with Cal Hobbs, Idiea Andrew Nwaji, and Matt McKensi of GM.

45. Owner's primary role in the agreement was to allow RCC payments into the Owner's Synovus Bank account (the Account) from GM clients who purportedly purchased insurance policies from individual agents.

46. The polices purportedly sold and marketed by GM were identified to Owner as identity theft protection plans provided via LifeLock, a nationally branded identity theft and recovery service.

47. The RCC payments from GM were to be received into the Account via Synovus Bank's Lockbox Deposit Service.

48. Upon receipt, Synovus Bank electronically deposited the receivables from the Lockbox Deposit Service into the Account.

49. Beginning on or about November 21, 2023, the following deposits from Owner's Lockbox Deposit Service were deposited into the Account:

| Date | Description | Amount |
| --- | --- | --- |
| 11/21/2023 | Lockbox Deposit | $ 250,960.16 |
| 11/22/2023 | Lockbox Deposit | $ 253,146.15 |
| 11/24/2023 | Lockbox Deposit | $ 1,009,328.09 |
| 11/27/2023 | Lockbox Deposit | $ 47,292.48 |
| 11/28/2023 | Lockbox Deposit | $ 503,738.56 |
| 11/29/2023 | Lockbox Deposit | $ 114,877.12 |
| 12/5/2023 | Lockbox Deposit | $ 215,087.36 |
| 12/12/2023 | Lockbox Deposit | $ 765,376.72 |
| Total Deposits | | $ 3,159,806.64 |

50. The deposits into the Account from Owner's Lockbox Deposit Service were comprised of approximately 6,116 RCCs.

51. The RCCs received by the Lockbox Deposit Service arrived between November 21, 2023, through December 12, 2023.

52. The value of the RCCs ranged from approximately $15.00 to $792.00.

53. Immediately after Owner's Lockbox Deposit Service began receiving RCC payments, Synovus was notified by the RCCs' originating financial institutions of the suspected fraud.

54. Several accounts of the suspected fraud from the originating financial institution's customers provided the following information to Synovus Bank:

    A. On or about November 23, 2023, Cadence Bank reported to Synovus Bank unauthorized RCCs debited from two of their customer's accounts were deposited into Owner's Lockbox Deposit Service. Both customers reported the checks as unauthorized. One of the customers previously reported being victimized in a fraud scheme.

    B. On or about November 28, 2023, Morgan Stanley Investments reported to Synovus Bank unauthorized RCCs debited from three of their customers' accounts were deposited into Owner's Lockbox Deposit Service. All three customers reported the checks as unauthorized. None of the three customers reported purchasing any policies or authorizing anyone to purchase a policy on their behalf.

    C. On or about November 30, 2023, First Financial Bank reported to Synovus Bank unauthorized RCCs debited from seven of their customers' accounts were deposited into Owner's Lockbox Deposit Service. All seven customers reported the checks as unauthorized. The seven First Financial Bank customers reported having no prior association with the owner of the Synovus Bank account.

    D. On or about November 30, 2023, a Regions Bank representative reported to Synovus Bank numerous unauthorized RCCs debited from multiple customer accounts were deposited into Owner's Lockbox Deposit Service. All of the Regions Bank customers indicated they had no ties to the Synovus Bank customer in whose account their funds were deposited. All of the Regions Bank customers

reported the checks as unauthorized.

55. Because of the suspected fraud, the originating financial institutions submitted approximately 3,926 RDIs to Synovus in an effort to indemnify their customers.

56. In response to the RDIs, Synovus used approximately $2,033,657.00 of the monies deposited into Owner's account to indemnify the defrauded customers.

57. On December 5, 2023, Owner was interviewed by Synovus Bank Financial Crimes Investigator Calvin Collins regarding the large volume of RCCs deposited into the Owner's Account via Lockbox Deposit Service.

58. Owner advised that the Owner was the only person who had access and control over the Account.

59. Owner stated the Owner was told by GM the amounts and account numbers for the Owner to wire transfer monies received into the Owner's Account via Lockbox Deposit Service from the RCCs.

60. The Owner used the Account to wire approximately $180,247.76 to a bank account associated with GM on November 28, 2023, which funds contained fraud proceeds as detailed above.

61. The Owner also used the Account to wire approximately $498,798.70 to a bank account associated with GM on November 28, 2023, which funds contained fraud proceeds as detailed above.

62. After reviewing the Account activity with Collins, Owner acknowledged the Account was likely used to propagate fraud via the Lockbox Deposit Service deposits.

63. Owner advised Collins that the Owner had been "baited" and added the people the Owner had been working with "are most likely not who they say they are."

64. Owner advised Collins that after multiple attempts the Owner has been unable to contact Cal Hobbs, Idiea Andrew Nwaji, Matt McKensi, or anyone associated with the GM agreement.

65. Owner disavowed any claim or rights of ownership to the remaining monies in the Account, including the entire balance of the **Defendant Property.**

66. Synovus has identified the remaining assets in the Account, including the entire balance of the **Defendant Property**, as the proceeds of money laundering activity.

67. As a result of the facts set forth herein, the **Defendant Property**, which was seized from the Account, constitutes and is derived from proceeds of wire fraud, bank fraud, and wire and bank fraud conspiracy, as well as property involved in and attempted to be involved in, and traceable to, property involved in money laundering and money laundering conspiracy, and is therefore subject to forfeiture.

68. Transactions and attempted transactions involving the **Defendant Property,** and property traceable to such property, included monetary transactions of over $10,000 in criminally derived property and which were derived from specified unlawful activity, to wit, wire fraud, bank fraud, and wire and bank fraud conspiracy.

69. The **Defendant Property**, and property traceable to such property, was used to conceal and disguise the nature, source, ownership, and control of those proceeds of the specified unlawful activity, in this case, wire fraud, bank fraud, and wire and bank fraud conspiracy.

70. This criminal scheme involved the use of interstate wires and impacted interstate commerce.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C)

71. The United States incorporates by reference the allegations contained in paragraphs 1 through 70 above as if set forth fully herein.

72. The **Defendant Property** is property that constitutes and is derived from proceeds traceable to one or more violation and attempted violation of 18 U.S.C. §§ 1343 and 1344.

73. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### Second Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C)

74. The United States incorporates by reference the allegations contained in paragraphs 1 through 70 above as if set forth fully herein.

75. The **Defendant Property** is property that constitutes and is derived from proceeds traceable to one or more violation of 18 U.S.C. § 1349, which is a conspiracy to violate 18 U.S.C. §§ 1343 and 1344.

76. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### Third Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A)

77. The United States incorporates by reference the allegations contained in paragraphs 1 through 70 above as if set forth fully herein.

78. The **Defendant Property** is property that was involved in a transaction or attempted transaction, or is property traceable to such property, in violation of 18 U.S.C. §§ 1956 and 1957.

79. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### Fourth Claim for Relief
### (Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A)

80. The United States incorporates by reference the allegations contained in paragraphs 1 through 70 above as it set forth fully herein.

81. The **Defendant Property** is property that was involved in, or traceable to such property, a conspiracy to commit a violation of 18 U.S.C. §§ 1956 and 1957, in violation of 18 U.S.C. § 1956(h).

82. The **Defendant Property** is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## CONCLUSION

83. WHEREFORE, the United States of America prays that:

    a.    Process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the **Defendant Property**;

    b.    The **Defendant Property** be forfeited and condemned to the use and benefit of the United States;

    c.    The United States be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper; and

    d.    That due notice be given to all parties to appear and show cause why the forfeiture of the **Defendant Property** should not be decreed.

Respectfully submitted,

MARGARET E. HEAP
UNITED STATES ATTORNEY

By:   */s/ J. Bishop Ravenel*
      J. Bishop Ravenel
      Assistant United States Attorney
      Virginia Bar Number 70250
      P.O. Box 8970
      Savannah, GA 31412
      (912) 652-4422

## VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM*

I, Special Agent J. Marcus Kirkland, have read the foregoing Complaint for Forfeiture *In Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 22nd day of October 2025.

_____
Marcus Kirkland
Special Agent
Federal Bureau of Investigation